## Reilly, Appellant, *v.* Mountain Coal Company.

*Land law—Deputy surveyor's book—Public record.*

The book which the act of 1785 directs that every deputy surveyor shall keep, and into which he " shall make fair and clean entries of all warrants put into his hands," is a public record.

Where a deputy surveyor has entered in his book a warrant as well as a plot of the survey made by him in pursuance of the warrant, but makes no return of the survey, and another deputy surveyor more than fifty years thereafter, returns the survey after having examined it on the ground, and found it to be correct, the title remains good in the original warrantee, or his successors, if no rights of other parties have intervened.

*Deed—Deed from commonwealth—Acknowledgments.*

A deed by the commonwealth for land owned by it, is in the nature of a patent for vacant land, and prior to the act of March 14, 1846, such a deed executed in the name of the commonwealth and under its great seal could be recorded without acknowledgment.

Argued Oct. 15, 1902.    Appeal, No. 21, Oct. T., 1902, by

plaintiff, from judgment of C. P. Cambria Co., March T., 1899, No. 286, on verdict for defendant in case of John Reilly v. Mountain Coal Company. Before McCollum, C. J., Mitchell, Dean, Fell, Brown, Mestrezat and Potter, JJ. Reversed.

Ejectment for lands in Summerhill township.    Before Barker, P. J.

The facts are stated in the opinion of the Supreme Court.

The court refused to admit in evidence a deed in the name of the commonwealth under its great seal to Dorothea Brien, recorded in 1844, in Cambria county, but not acknowledged.

Plaintiff presented these points :

1. As against the alleged title of the defendant which had its inception by warrant dated March 19, 1889, on which patent was issued on August 18, 1899, the sale to Brien and Coleman of March 11, 1808; the power of attorney from Dorothea Brien to Abraham Morrison dated August 8, 1845, and recorded June 26, 1847; the deed of Dorothea Brien by her attorney in fact, Abraham Morrison, to Henry McKenzie, dated December 31, 1849, and recorded May 24, 1889, with the recital therein of conveyance by "secretary of commonwealth of Pennsylvania, by deed dated January 4, 1843, to Dorothea Brien in fee ;" the last will and testament of Henry McKenzie, dated February 23, 1850; the petition of the executor of the last will and testament of Henry McKenzie, deceased, to sell the land claimed by the plaintiff in this action, with the order of the court under date of September 13, 1853; the sale of the land as confirmed by the court on December 5, 1853; the deed from Sylvester McKenzie, executor, to Bernard McColgan, dated December 22, 1853, and recorded November 20, 1854, with the recitals therein; the deed of Bernard McColgan to John Reilly dated March 21, 1871, and recorded April 22, 1889, for the land claimed in this case by the plaintiff, with a recital therein as follows : " Being the same tract of land, inter alia, which the secretary of the commonwealth of Pennsylvania, by deed dated January 4, 1843, and recorded in recorder's office of Cambria county, in record book, vol. 7, page 357, etc., conveyed to Dorothea Brien; and Abraham Morrison, attorney in fact of Dorothea Brien, by deed dated December 3, 1849, conveyed to Henry McKenzie; and Sylves-

ter McKenzie, executor of the last will and testament of Henry McKenzie, by deed dated December 22, 1853, and recorded in recorder's office of Cambria county in record book, vol. 13, page 201, sold and conveyed, by virtue of an order of the orphans' court of Cambria county, to Bernard McColgan, party hereto ; " the deed of F. H. Barker, treasurer of Cambria county, to S. W. Davis, dated June 8, 1896, recorded July 9, 1898, "All that certain tract of land held in the name of John Reilly, in Summerhill township, Cambria county, containing four hundred and thirty-nine acres ;" deed of assignment of S. W. Davis and Sarah J. Davis, his wife, to John Reilly, dated July 8, 1898, and recorded July 9, 1898 ; assessment of the land claimed by the plaintiff to John Reilly from the year 1880 continuously to this date ; the jury may find a good title vested in John Reilly, and if the jury find in addition thereto from the evidence that the location contended for by the plaintiff under the warrant and survey of John Nicholson is the true location of the land claimed by the plaintiff, the jury may find a verdict in favor of the plaintiff.   Not answered.  [3]

4. If the jury find that the Mitchell warrant under the date of March 19, 1889, and the return of survey made thereunder were located upon the lands surveyed under the John Nicholson warrant of August 8, 1793, which survey was accepted by the commonwealth September 15, 1847, and if the jury further find that the plaintiff is the successor in title to John Nicholson under his said warrant, their verdict should be for the plaintiff for the land described in the writ.   Not answered.  [4]

Defendant presented these points : ·

6. The record of the return of survey of John Nicholson tract of August 8, 1793, shows that George Woods, and he alone, made the survey in 1793.   The tract must be located by evidence of marks of such survey in 1793, and failing in such evidence, then it must be located by adjoiners.  *Answer :* Affirmed.  [5]

8. The jury must not consider the evidence of J. Murray Africa as to the Cadwallader Evans tract being a John Musser tract, as his evidence is based upon his recollection of the contents of papers which were not produced, and is therefore incompetent.  *Answer :* Affirmed.  [6]

9. Where, as in this case, it appears from the return of survey that the surveyor in locating the tract went upon the

ground and made the survey, calls for streams and other natural monuments are of great weight in determining the location of the tract. *Answer:* Affirmed. [7]

The court charged in part as follows:

[You will have nothing to do with anything in this case except to determine this one question, if you can, where did George Woods survey this piece of land in 1793? In other words, did he survey the land where the plaintiff in this case claims he did, that is, as shown on his map by the red lines? If he did not survey and locate that piece of land where the plaintiff claims he did, as shown on that map by the red lines, then, of course, the plaintiff has nothing to do with the land covered by that survey and claimed by the defendant, and cannot recover. The only questions of law in the case are those which we shall give you to guide you in your deliberations in determining that question, as to where George Woods did locate this tract of land.] [8]

[It very frequently occurs, as in the past—not so much now, since land titles have been better settled—that these controversies arise between two persons, each of whom owns warrants, surveys and patents out of the commonwealth, and it is claimed one interferes with the other, that one is laid partially on top of the other, and certain rules have been laid down, and, mainly, the rules that have been laid down are in relation to cases of that kind. There are two warrants, surveys and patents here that interfere, but these rules do not apply in this case, because it is a question here of the actual location on the ground of the John Nicholson warrant as claimed by the plaintiff.] [9]

[The presumption is that Mageehan merely returned to the land office a copy of the survey, out of the book, made by Woods, but he states in his return that it was examined by him and found correct. Now, of course, if it were proven as an absolute fact in this case, that Mageehan made a survey on the ground and it differed from that made by Woods, the Woods survey would prevail. He would have no authority to change the survey made by Woods. He would only have authority to report to the land office what survey was made by Woods.] [10]

[But the land office has accepted the return of the survey made by Woods, in the handwriting of Mageehan, in which he states that he examined it and found it correct, and we feel that if there was absolute proof here that Mageehan had marked a line on the ground, on the date when he says he examined this, and marked it as shown on the draft introduced in evidence, that while it is not evidence in itself alone, and could not be, if there was nothing else in the case, of the true location of this, yet, if it throws any light on the location made by Woods, originally, then it is evidence in this case, and not otherwise.] [11]

[Now, independent of any bearing that this survey, alleged to have been made by Mageehan, has upon the question as to whether or not Woods made such a survey, it is valueless as evidence, for the reason if he was not going over the ground that George Woods went over, then his survey is valueless. He had no authority to make other lines, he had no authority to make new lines. The plaintiff's title must rest upon the survey made by George Woods.] [12]

[We simply instruct you that your duty is, from the evidence in the case, to follow the footsteps, if you can, of George Woods in 1793, and see whether or not he located this land as claimed by the plaintiff. If you find, from the weight of the evidence, that he did, under our instructions as to the way in which you shall apply that evidence, then render a verdict for the plaintiff. If you find that he did not locate it there, and it matters not where else he may have located it, then your verdict would be for the defendant.] [13]

Verdict and judgment for defendant. Plaintiff appealed.

*Errors assigned* were (1, 2) rulings on evidence; (3–13) above instructions, quoting them.

*Geo. A. Jenks,* with him *W. Horace Rose* and *Chas. Corbet,* for appellant.—The acts which provide for an acknowledgment of deeds, in order to qualify them for recording, do not apply to patents granted by a sovereign to a citizen. The seal of the state is evidence of the genuineness of the patent. It is equivalent to the act and deed of all of the citizens of the state, each of whom is party to the conveyance, with the same effect

as though every citizen of the commonwealth had subscribed his hand and seal thereto.

The presumption as against a junior survey after twenty-one years becomes absolute in favor of the first purchaser: Glass v. Gilbert, 58 Pa. 266, 292; Ormsby v. Ihmsen, 34 Pa. 462; Lambourn v. Hartswick, 13 S. & R. 113.

Under the early custom of the land office, warrants were issued in the names of persons who were not the real owners, and, in some cases, fictitious names. The payment of the purchase money vested the warrants in the person who paid for them: Reynolds v. Dougherty, 3 S. & R. 325; Balliot v. Bauman, 5 W. & S. 150; Delaware & Hudson Canal Co. v. Dimock, 47 Pa. 393; Smith v. Vasbinder, 77 Pa.127.

*P. J. Little,* with him *S. M. Jack, D. B. Taylor, Alvin Evans, J. W. Leech, John E. Evans, Mathiot Reade* and *M. D. Kittell,* for appellee.—The deed to Dorothea Brien conveys only the equitable interest held by John Nicholson. It is not a conveyance of any title from the commonwealth. The commonwealth in the sale of her lands has no attribute of sovereignty. She acts in business of that kind as a private individual, and is bound by the same rules of law and justice that govern individuals : Hole v. Rittenhouse, 25 Pa. 491.

This deed comes within the recording laws, and could not be properly recorded without proof of execution of the deed, or an acknowledgment: Act of May 28, 1715, 1 Sm. L. 94, sec. 2. Not being a proper record, plaintiff could not offer same in evidence: Velott v. Lewis, 102 Pa. 326—333; Vickroy v. Mc-Knight, 4 Binney, 204.

If the original marks, or any of them, are found on the ground, they must govern. In case no marks be found, adjoining surveys will govern: Jackson v. Lambert, 121 Pa. 182; Pruner v. Brisbin, 98 Pa. 202; Younkin v. Cowan, 34 Pa. 198; Renn v. Penna. Hospital, 2 S. & R. 413; McCall v. Sybert, 4 Watts, 431.

After the survey is made on the ground, the warrant is exhausted. A new survey cannot be made without new directions : 2 Smith's Laws, 255; Cecil v. Amberson, Addison, 359; Fritz v. Brandon, 78 Pa., 342.

And no resurvey without an order for that purpose is of any

validity whatever, either against the commonwealth or any other claimant: Mineral Railroad & Mining Co. v. Auten, 188 Pa. 568. And this is the case whether the first return has been formally accepted or not: Hughes v. Stevens, 43 Pa. 197.

A party cannot prove the return of survey by any other evidence than that found in the land office: Roland v. Loud, 13 Pa. 464, 469.

The return of James Mageehan that George Woods made the survey of thé Nicholson tract in 1793 is conclusive of that fact. No other survey could be made on that warrant without an order of the board of property. Mageehan, before returning the survey made by Woods, examined it. This simply means that he examined the records of Woods and found there the certificate of Woods, that the survey was made, and when and where: Act of April 8, 1785, 2 Sm. L. 317.

OPINION BY MR. JUSTICE DEAN, January 5, 1903:

Plaintiff brought ejectment to recover from defendant possession of about 307 acres and 112 perches of land in Summerhill township, Cambria county, warranted in the name of John Nicholson, August 8, 1793. The warrant was put into the hands of George Wood, at that time deputy surveyor for Bedford county, within those territory the vacant land described in the warrant was at that time situated. He made survey of the land to satisfy the warrant and entered the plot or draft of his survey in a survey book kept by authority of law for that purpose in his office. Cambria county was organized in 1804 and its territory included that part of Bedford county in which this land lay. The records including this survey of the deputy surveyor of Bedford, so far as they affected the land in the new county, went into the hands of the deputy surveyor of Cambria. This book containing copies of the surveys was not a mere private memorandum of the surveyor; it was much more than that; it was a book which the law directed him to keep, therefore, was a public and official record. The act of 1785 directs "that every deputy surveyor who shall receive any such warrant, shall make fair and clean entries of all warrants put into his hands in a book provided by him for that purpose."

Section 9 of the same act directs how the warrant shall be executed, " By actually going upon and measuring of the land

and marking the lines to be returned upon such warrant." And it was further directed that such surveys should be returned into the land office by the deputy surveyor " as soon as conveniently may be after such survey shall be made upon the payment or tender of the fees to which such deputy surveyor shall be legally entitled for his services therein." It is then provided, that if the survey be not made before December 31, in the year the warrant came to hand, and returned into the land office before the last day of March in the next year, it shall be void as to future surveys of the same land returned before any return of the first survey. Then follow heavy penalties on the deputy for neglect of duty, and a formal official oath to perform his duty with impartiality and fidelity. The warrant was applied for by John Nicholson on August 3, 1793, and issued to George Woods, the deputy surveyor of Bedford county, August 8, 1793. It was duly entered by him in his book as well as a plot of the survey made by him in pursuance of the warrant. A mere glance at this plot shows that Woods in substance asserts that it was made upon the ground. The corners are indicated by trees of different species, and adjoiners on three sides are marked. Why the survey was not returned does not appear from any of the records in evidence ; whether the deputy was not paid or tendered his fees which the warrantee was bound to pay before return, or for some reason other than neglect, can now be only a matter of conjecture.

There was subsequent legislation in 1792, 1793 and 1794 in reference to deputy surveyors, but no substantial change was made prescribing his duties in the particulars noticed. In 1804, as before noticed, the territory for which this warrant called, become part of Cambria county, and Woods' official book of warrants and surveys went into the hands of James Mageehan, deputy surveyor for Cambria county. Still, for years no return was made of the Nicholson survey, but in 1847 Mageehan returned it into the land office, with this certificate appended to the plot:

" Situate on one of the South branches of the Conemaugh, Summerhill township, Cambria county and surveys joins, in pursuance of a warrant granted to John Nicholson dated the 8th of August, 1793, surveyed by George Woods, deputy surveyor

of. Bedford county, in 1793, in pursuance of said warrant and examined by me the 10th day of July, 1842, and found correct.

"JAMES MAGEEHAN,

"D. S. of Cambria County."

Unquestionably, this was a lawful return of Woods's survey by his successor having authority as to this part of the territory theretofore Bedford county. Up to the date of it no intervening right had been asserted. If the land was vacant in 1793, it continued vacant as to all persons except Nicholson or those claiming under him, down to 1847. It should be noted here that certain proceedings had been had with reference to this land between 1793 and 1847. The commonwealth claimed an indebtedness from Nicholson; proceedings were had under the act of 1807 to adjust and fix the indebtedness and make sale of his lands; to that end commissioners were appointed who certified they had on March 11, 1808, made sale of his lands, among others, this tract warranted August 8, 1793, to Edward Brien and Robert Coleman for the sum of $891.94, and that the purchasers had given bond with security, conditioned for the payment of the purchase money to the commonwealth. Afterwards both purchasers having died, the widow and heirs of Coleman conveyed all their interest in the land to Dorothea Brien, widow and sole heir of Edward Brien, and she paid the full amount of the bond to the commonwealth. In consideration, the commonwealth under its seal on January 24, 1843, conveyed to her the Nicholson tract here in dispute.

Under the law and usage of the land office, the owner of the Nicholson warrant had no right to claim the issue of a patent, for his survey had not been returned, nor had the purchase money been paid; but the commonwealth, treating him as the equitable owner, sold the land for his debt, accepted the full purchase money from the purchaser, and delivered to his widow a deed therefor; then four years after accepted Mageehan's return of the Woods survey. These are in substance the material facts of the case.

If the result of the issue depended on the exact date of plaintiff's inception of title, as between him and defendant, it might become important to inquire just what title Nicholson had acquired by his warrant and survey before the return of Mageehan,

which was the question in Drinker v. Holliday, 2 Yeates, 87,
and like old cases. But here, defendant claims no title prior to
1889, more than forty years after Mageehan's return; the com-
monwealth then grants the land to defendant's grantor, Robert
Mitchell. Was the land still hers to convey? That depends
on whether it had been appropriated before under the Woods
survey, either in 1793 or by Mageehan's verification and return
in 1847 on the Nicholson warrant. It seems to be conceded that
Woods's marks, if he had made them on the ground, have now
disappeared; at the time of the trial the survey had been made
107 years before; but leaving out of view for the present the
survey of 1793, what about the return of Mageehan in 1847?
In his certificate he does not say he resurveyed the tract or
remarked its lines, but he says it was surveyed by Woods in
1793, and "examined by me the 10th day of July, 1842, and
found correct." The learned judge seems to have assumed
that Mageehan's sole duty was to copy Woods's survey from
his book and return it to the land office, and that it is improb-
able he went upon the ground. We do not think the facts
warrant such inference. If, as argued, the words, "examined
by me and found correct," mean only, that he examined the
plot or plan of survey in the book and that he found it correct,
it may well be asked, how could he find a survey correct by
a mere examination of the book? That showed nothing but the
warrant and plot; whether correct or incorrect there was in the
book no means of ascertaining. Mageehan's duty was precisely
what Woods's would have been had the land remained undetached
from Bedford county and Woods had survived and held office
in 1842. He would have then known, that for nearly fifty years
the survey had remained in his office not returned; whether
the land or any part of it had been appropriated under later
warrants he could not tell; he might have been familiar with
other and adjoining surveys in that region; it would have been
not only his right but his duty, as a conscientious public officer,
to again go upon the ground and re-examine the survey, not for
the purpose of changing its location, but for the purpose of as-
certaining whether junior rights had, in this lapse of time, inter-
vened, which affected the old survey. If any had, it was his
duty to note them in his return to the land office. What it
would have been Woods's duty to do, was just as plainly that of

Mageehan.  Our inference from the wording of the certificate is, that he examined the survey on the ground and found the map of it correct.  It needed verification which could only be had by going upon the ground and this in all probability he did.  And this view is corroborated by the testimony of Africa and Mitchell, experienced surveyors.  Africa testifies he first went on the ground, having with him a copy of the original survey in 1896 ; found a birch corner which counted to 1842, ran east 218 perches on line marked 1842 ; he then ran north from the birch and found a well marked line of 1842 and along the eastern line of the Nicholson found marks of 1842 ; he also testified to other marks of that year.  William P. Mitchell, a surveyor of long experience, testifies to the same effect.  Neither their credibility nor their capability is questioned.  Some one in 1842 ran and remarked the lines of 1793.  It is highly probable that at that date, fifty years after they were made, not all the marks made by Woods had been obliterated, and Mageehan could follow with reasonable certainty his footsteps.  The early surveyors made but few monuments on the ground compared with the later ones and were very inexact in their measurements; this land was then worth only twenty cents an acre and they were not particular.  Therefore, from the certificate itself and the evidence tending to show the lines of 1842, we think the evidence was very significant, that Woods in 1793 actually ran this survey on the ground; Mageehan followed him in 1842, and from his own observations on the ground, verified the correctness of Woods's plot; consequently, from his own examination, he certified to its correctness.

The learned judge of the court below seems to have tried the case throughout on a wrong theory, that is, that 107 years after the Nicholson survey, the plaintiff must locate his land by visible marks on the ground, failing in that, he must locate it by adjoiners ; that he could not locate the survey by evidence clearly tending to show that it had been located by marks on the ground, and that if they had disappeared, and after this lapse of time there was no living witness who could testify he had ever seen them, then, such being the case, he in effect held that plaintiff must prove the location by adjoiners.  This second kind of evidence was somewhat doubtful; two of the adjoiners marked on the plot were pretty clearly proven; the

others, if not mistakes, were at least doubtful; Woods may have been wholly mistaken as to the warrantee of several of the adjoining tracts, or the warrantee name of them may have been changed in the surveys, but he could not have been mistaken as to what he did on his own survey.   The result was to confine the attention of the jury to the one method of proof, that by adjoiners, the evidence bearing on which was conflicting and doubtful; this, in effect, made the plaintiff's case turn on its weakest point.   The appearance of the map with its four distinctly named corners, the certificate of Mageehan, his apparent work on the ground to verify Woods's plot or map, were very significant facts pointing to an actual location on the ground in 1793 by Woods, and the jury should have been so instructed.   It would be impossible to locate many, perhaps a majority, of the older surveys by the rigid rule of evidence adopted here.   Nearly all the lands described in our old acts of assembly as "within the limits of the late purchase from the Indians," or as "lands lying east of Allegheny river and Conewago creek" were, when warranted, unbroken forest; a very large part was taken up by tracts and blocks, and the surveys indicated by but few marks on the ground; many of these marks, sometimes all of them, are obliterated by time, the elements or the hand of man, so that it is, after the lapse of more than a century, impossible to locate them by marks on the ground to-day visible; but it is possible to prove by unbroken recognition of their boundaries through generations, their original location; as the years pass and the date of the original monuments become still more remote, not a vestige of them will remain, so that the next best evidence of where the original marks were when made is proof of where they were recognized to be while still in existence.   This testimony is in effect that of a sworn officer, as to the 1793 location on the ground by his own marks on the boundaries verifying the map; it is the strongest kind of evidence as to the original location by Woods.

A very brief glance at the undisputed facts here, shows the grievous weight of the burden placed upon the plaintiff at the trial.   The deputy surveyor of the commonwealth was bound by his official oath to go upon the ground and execute this warrant; he in substance, by his plot recorded in his book, says he did go upon the ground, measure the land and mark the

corners; fifty years afterwards, his successor verifies his work and makes return of the survey, although other vacant land was taken up all around the region about that time and subsequently no one attempts to appropriate this tract; ninety-six years afterward, defendant's predecessor in title, Mitchell, covers it with another warrant and survey, alleging it to be vacant. On his nominal possession he stands and says, to plaintiff, " Prove your title by showing marks on the ground made 107 years ago, or prove that your surveyor made no mistakes in naming his adjoiners; true, my title is only ten years old, but I can point to marked trees of that age and locate my survey by visible marks on the ground, therefore my title must prevail."

What we have said in effect sustains appellant's fifth assignment of error.   The defendant's sixth written prayer for instructions was as follows: " The record of the return of survey of the John Nicholson tract of August 8, 1793, shows that George Woods and he alone made the survey of 1793.   The tract must be located by evidence of marks of such survey in 1793, and failing in such evidence, then it must be located by adjoiners."

This point was affirmed with this explanation:

" We have already instructed you to this effect with the additional instructions as to the weight you must give to the evidence regarding the line alleged to have been run in 1842." In the general charge the learned judge says: " The warrant is to be located according to the survey made by Woods.   If you do not find any marks on the ground, and we do not here, you must locate it by adjoiners.   But the land office has accepted the return of survey made by Woods in the handwriting of Mageehan, in which he states he examined it and found it correct, and we feel that if there was absolute proof here that Mageehan had marked a line upon the ground at the date when he says he examined it, and marked it as shown in the draft introduced in evidence, that while it is not evidence in itself alone, and could not be if there was nothing else in the case of the true location of this, yet if it throws any light on the location made by Woods originally, then it is evidence in this case and not otherwise."

This explanation, when considered in connection with the affirmation of the point, wholly fails to give any proper significance to the fact adverted to.   The return with the certificate,

followed by the evidence of Africa and Mitchell if they were believed, tended strongly to establish a fact, which, if established, was of itself sufficient to warrant a verdict, that Woods had made and marked his survey on the ground. It more than threw light on the location by Woods; it proved it. The learned judge not only belittles the evidence, but wholly neutralizes the effect it was entitled to with the jury. If the weight of the evidence established the fact of location in 1793, then Ormsby v. Ihmsen, 34 Pa. 462, squarely rules the case in favor of plaintiff. The return made by Mageehan in 1847, remained unchallenged for forty-two years, just twice twenty-one years. In the case cited, we said, as to the presumption of the correctness of a return into the land office after twenty-one years:

"It is more than a mere probability; it is presumptio juris et de jure, a legal conclusion. The marks which it is the duty of the surveyor to make on the ground cannot be permanent; posts and stones may be removed, either accidentally, or by design; trees may be cut down, or decay; the progress of cultivation and improvement tends to obliterate them, and just in proportion as the land increases in value, do the evidences of title furnished by the surveyor's marks disappear. Where lands have been improved, it would seem more reasonable to expect that no traces of the surveyor's lines should be found after twenty-one years, then that any should remain. Titles would be insecure, indeed, if, after such a period, the absence of visible marks were held sufficient to invalidate a returned survey. Time, also, removes living witnesses; the surveyor and his assistants may die, and necessarily, therefore, resort must be had to the return itself, as evidence furnished by the officer of the law of what he has done."

While the language in Ormsby v. Ihmsen would seem to indicate that after twenty-one years the return is absolutely conclusive, both as to the facts of location on the ground and its boundaries, this has been explained in subsequent rulings. In Malone et al. v. Sallada et al., 48 Pa. 419, Justice Agnew in his concurring opinion says it (Ormsby v. Ihmsen) does not change the law as theretofore held, but merely furnishes us with the elements of an additional rule; "that is, where from the return of the survey itself we can discover that the call for an adjoiner is a mistake, even though no line can be found upon the ground

corresponding to the line in the return, the call may be controlled by the line as returned and the other evidences of location contradictory to the call." In Packer v. Schrader Mining, etc., Co. 97 Pa. 379, the case on its facts was held to be ruled by Ormsby v. Ihmsen, in these words : " The regularity of the survey being thus legally fixed and absolute, it but remains for a jury to determine whether upon the ground, such lines, adjoiners or other marks can be found, as will, to a reasonable certainty, determine the location of plaintiff's claim." It was held in this case that the only question was, was there a corner or line found on the ground which was a corner or line of this tract in dispute ? If so, the question was solved, for the survey must then be made by the courses and distances in the return.    To the same effect are Grier v. Penna. Coal Co., 128 Pa. 79, and Bushey v. South Mountain Mining and Iron Co., 136 Pa. 541.    In the last case it is held that " the rule that after the lapse of twenty-one years, the law presumes that a survey regularly returned was made as returned, cannot locate a survey until some monument of it can be found upon the ground.    If one or more such marks be found, the law will locate the survey by the aid of legal presumption."

It follows then, that while the rule in Ormsby v. Ihmsen would not authorize Mageehan to go into the woods in 1842 and run the courses and distances of Woods's plot and then return it into the land office, yet if he found a single one of Woods's marks, he could from that mark, by courses and distances, run the survey on the ground and return it into the land office.    That return, unquestioned for twenty-one years, would be conclusive as to the location of the Nicholson warrant. Where, as here, the defendant denies that either Woods or Mageehan was upon the ground, the return would only be prima facie evidence in plaintiff's favor, but as we have before noticed, the decided weight of the evidence shows that Mageehan did go upon the ground in 1842, found marks of Woods sufficient to identify the location, and then re-ran the lines of Woods and made return thereof in 1847.

To the same effect are Glass v. Gilbert, 58 Pa. 266, 292, and Mock v. Astley, 13 S. & R. 382.

What we have said in substance sustains appellant's eighth, tenth, eleventh, twelveth and thirteenth assignments ; the

others, except the first and second, become unimportant on a retrial.

As to the first and second, they have as their foundation, the rejection, as evidence, of a deed offered by the plaintiff.   As before noticed, Nicholson had become indebted to the commonwealth for lands purchased by him; he had formerly been controller general of the state and was one of the prominent land speculators of that day, and a large purchaser of land from the commonwealth by warrant and survey; was also a large debtor to her. By special act of March 31, 1806, Nicholson being then dead, the governor was empowered to appoint three commissioners to ascertain, settle and adjust the amount of his indebtedness, ascertain the quantity and quality of his lands in each county, subject to lien for unpaid purchase money to the commonwealth; for this purpose they were given access to the land office with the right to inspect all necessary papers.   As a supplement to this act, that of March 19, 1807, was passed, authorizing the commissioners to make public sale of Nicholson's lands after due notice in a newspaper printed in the county or nearest to it and in Philadelphia, and make report to the governor.   He appointed Heister, Evans and Lyon commissioners, who afterwards reported that they had, on March 11, 1808, at Sowers Tavern in the borough of Lancaster, after due notice, sold, among other tracts, one on the head waters of the Little Conemaugh between Allegheny Hill and Conemaugh old town, held by John Nicholson, under warrant of August 8, 1793, containing 439 acres and 112 perches, to Edward Brien and Robert Coleman, and that the commissioners had taken bond with good security for the payment of the purchase money for all the land sold that day, $891.94, to the same purchasers.   Between that date and January 4, 1843, both Brien and Coleman having died, the widow and heirs of Coleman conveyed all their interest in the land to Dorothea Brien, widow and sole heir of Edward Brien; she paid and had satisfied in full the bond given by Coleman and her husband to the commonwealth.   The commonwealth then conveyed to her on January 24, 1843, among other lands, all the estate of Nicholson in the tract warranted August 8, 1793, the land in dispute.   The deed is signed " A. V. Parsons, Secretary of the Commonwealth," with the great seal of the commonwealth affixed.   On June 8, 1844,

this deed, without acknowledgment, was duly recorded in the office for the recording of deeds in Cambria county.

Afterwards, Dorothea Brien sold and conveyed this tract to one McKenzie, and from him by a regular series of conveyances, the plaintiff in this suit became the owner. The plaintiff offered to read from the record this deed, as proof of title. Defendant objected because it was not acknowledged before an officer having authority to take acknowledgments of deeds. The court sustained the objection and excluded the deed. Was this ruling correct? Unquestionably, the deed was executed and delivered by the commonwealth to Dorothea Brien, plaintiff's predecessor in title. If accepted, for what on its face it purports to be, it put in the purchaser whatever title the commonwealth had acquired by the commissioner's sale. By the 2d section of the act of 1807, the secretary of the commonwealth, on certificate of the state treasurer, that the purchase money of the John Nicholson land, as fixed by the sale and report of the commissioners, had been paid, was directed to make and deliver to the purchaser a deed for such estate as Nicholson had in the land; therefore, by the authority of the supreme law of the land, the sovereign, with the great seal of the commonwealth affixed, executed and delivered the deed. In the very nature of our government there could be no higher civil authority. A patent from the commonwealth is simply a deed of land by her to a purchaser from her. The term, although seldom used, except in grants from the state to individual purchasers, under the land laws, is just as applicable to any grant of land by the commonwealth under any other laws. This instrument is a deed or a patent just as one chooses to call it. The act of 1781 prescribes the form of a patent or deed issued under the general laws regulating the grant of vacant lands by the state; the acts of 1806 and 1807 prescribe the form of the deeds to be executed for a grant of the "Nicholson court" lands; the latter are to all intents and purposes just as much patents as the former. There is not a word in any of the acts of assembly, or in any of the cases construing them, that restricts the word "patent" alone to grants of unappropriated vacant land purchased by warrant and survey.

Our recording acts were intended to provide for the proper authentication of deeds, that they might be placed of record

within the county where the land lay; the record then, or an exemplification of it, became evidence the same as the original; the record preserved by authorized copy the original instrument. Prior to the act of March 14, 1846, no law required that patents or deeds from the commonwealth, to entitle them to record in the counties where the land lay, should be acknowledged before any officer; the deed of the sovereign with the seal of the commonwealth was considered sufficient authentication to entitle them to record, and there are thousands of patents throughout the state issued and recorded before the act of 1846, without acknowledgment. Nor is the reason very obvious why the act of 1846 included deeds from the commonwealth as instruments requiring acknowledgment to entitle them to record. Why the commonwealth should appear before a justice of the peace and acknowledge her deed with her great seal affixed to be her act and deed, when the only evidence of her subordinate's authority was her deed (his commission), with her seal affixed, is not clear. Why go to the creature that he may certify to the identity of and genuineness of the act of his creator? But the act of 1846 so provides. This deed, however, was recorded June 8, 1844, and the 1st section of the act of 1846 expressly validates the record by enacting that "where any of the deeds aforesaid have heretofore been recorded in the office for recording deeds in the county where the lands lie . . . . the records thereof, or duly certified copies thereof, shall be as good evidence as if the same had been recorded under the provisions of this act."

We think the deed was properly recorded when presented for record, although not formally acknowledged, and the validity of its record is expressly ratified by the saving provision of the act of 1846. The record should have been admitted as an evidence of title on the part of plaintiff, for it tended to show an express recognition by the commonwealth of at least an equitable title in John Nicholson at the date of the sale of this tract by the commissioners directed to be appointed by the acts of 1806 and 1807. Appellant's first and second assignments of error are also sustained.

The judgment is reversed and a v. f. d. n. awarded.