## Keller *et al. versus* Young *et al.*

1. Clinton county having been erected out of two others, an act was passed May 11th 1848 directing commissioners " correctly to run and distinctly to mark the boundary line," their report to be " final and conclusive." April 28th 1857, another act was passed, appointing other commissioners, " correctly to run and mark distinctly the boundary line :" to make out two drafts, giving the names of the warrantees along the line, and in case of any discrepancy between " the drafts and the marks on the ground, the former shall govern and be final and conclusive ;" nothing was done under this act; and by another, February 25th 1859, commissioners were appointed " correctly to run and mark distinctly" the line and to lay down on their drafts the tracts through which the line may pass ; to make three drafts, one to be filed and kept as a matter of record ; the report to be " final and conclusive." The commissioners ran and marked the line, the courses and distances, &c., on the report, and divided a tract, which on the draft was laid down as all in one county. *Held*, the line was to be determined by the marks on the ground.

2. The marks on the ground placed part of a tract in Clinton county ; in the draft the whole tract was laid down as in the adjoining county, and was there taxed ; the part in Clinton was sold for taxes by the treasurer of that county : *Held*, that the title passed to the purchaser.

3. Laying down the tracts on the drafts was to facilitate finding the county line ; the act gave the commissioner no power to change the line of any tract of land, nor to decide on which side of the county line any tract might lie.

March 23d 1875. Before AGNEW, C. J., SHARSWOOD, MER-CUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the Court of Common Pleas of *Clinton county :* Of July Term 1874, No. 251.

This was an action of trespass, q. c. f., brought May 3d 1873, by Peter W. Keller and James David, against William B. Young, Edward Worth, R. T. Barber, Nathan McCloskey and others.

The *locus in quo* was originally part of a larger tract of 415 acres in Centre county, in the warrantee name of Peter Hahn. Subsequently, Clinton county was erected out of parts of Centre

[Keller v. Young.]

and Lycoming counties.  The whole tract was sold for taxes by the treasurer of Centre county to parties under whom the defendants claimed; the *locus in quo* was sold for taxes by the treasurer of Clinton county to parties under whom the plaintiffs claimed.

By Act of June 21st 1839, Pamph. L. 362, certain parts of the counties of Lycoming and Centre by boundaries, as designated in the act, so as to include Logan, Lamar and Bald Eagle townships, then in Centre county, were erected into a new county, to be called Clinton, and commissioners were appointed by the act to "ascertain and plainly mark the boundary lines" of the new county.

By the 7th section of the Act of April 11th 1848, Pamph. L. 505, other commissioners were appointed "correctly to run and mark distinctly the boundary line between said counties, agreeably to the act creating Clinton county, * * * the commissioners shall make out drafts, one to be filed in the commissioners' office of each of the aforesaid counties, * * * and the report of said commissioners shall be final and conclusive."  An Act of April 28th 1857, Pamph. L. 332, recited the appointment of the last commissioners; that they ran and marked the division line and reported a draft thereof according to law; it further recited that there was a discrepancy between the draft or report made by the commissioners and the marks on the ground of that part of the line from Beach creek to the west branch of the Susquehanna.  The act then appointed other commissioners "to run and mark distinctly the boundary line between said counties, from the west branch of the Susquehanna to Beach creek, agreeably to the act creating Clinton county, and the commissioners shall make out two drafts, giving the names of the warrantees, where known, along said division line, * * * and in case there should be any discrepancy between the drafts made by said commissioners and the marks upon the ground, the former shall govern and be final and conclusive."

These commissioners failed to act, and by Act of February 5th 1859, Pamph. L. 83, other commissioners were appointed, who "shall correctly run and mark distinctly the boundary line between the counties of Centre and Clinton, and it shall be the duty of said commissioners to lay down on their drafts the tracts of land through which the lines may pass, agreeably to the Act of Assembly creating such counties and the supplements thereto; and the said commissioners, or a majority of them, shall make out three drafts, one of which shall be filed in the commissioners' office of each of said counties, and the other be filed in the surveyor-general's office, there to be kept as a matter of record, * * * and the report of said commissioners shall be final and conclusive."

[Keller *v.* Young.]

On the 28th of November 1859, the commissioners reported :—

" We the undersigned, a majority of the commissioners named in the said act as commissioners aforesaid, do report the following courses and distances as being run and marked upon the ground as and for the division lines between the said counties.   Beginning at a fallen sugar-tree corner on the bank of the Susquehanna river;  *  *  *  thence south four miles and 260 perches;·*  *  *  then east along the division lines of certain tracts of land as represented on the diagram, east five miles;  *  *  *  then south three miles;  *  *  *  then south;  *  *  *  east two miles and 240 perches to the bank of Beech creek, and down the middle of said creek;  *  *  *  and we do further certify that, in pursuance of the requirements of the Act of Assembly, we used every means in our power to ascertain with certainty the true position of all the tracts of land through which the several courses run as laid down, and that the surveys as represented are correct in the respective counties."  *  *  *

The draft placed the whole of the Hahn tract in Centre county, making the county line the eastern boundary of the tract; the courses and distances as stated in the report and draft, and those marked on the ground, ran the line through the tract, leaving the *locus in quo*, a triangular tract of about 173 acres, in Clinton county.

On the trial before Mayer, P. J., September 17th 1872, the plaintiffs gave evidence of the assessment of the 173 acres, the *locus in quo*, in Clinton county, and its sale, for taxes of 1866–1867, by the treasurer, on the 8th of June 1868, to A. H. Strayer and William H. Brown; the vesting of their title under the sale in plaintiffs in 1870, and the cutting of timber on the tract by the defendants.

The defendants gave evidence of the assessment of the whole Peter Hahn tract, 415 acres, in Centre county, and its sale for taxes of 1850-1851, by the treasurer, on the 14th of June 1852, to John T. Hoover, and that this title was vested in the defendants in 1867.   The court, after stating the facts, the Act of Assembly, the filing of the report, and draft by the commissioners, charged :—

" There is also appended to the draft the report of two of the commissioners, in which they say ' that the surveys as represented are correct in the respective counties.'   From this draft it appears, as well as from the testimony, that the whole of the Peter Hahn tract was laid down as lying and being in Centre county, the division line as represented on the draft being the eastern boundary of the Peter Hahn tract.   It will be observed, that [as the Act of Assembly made it the official duty of the commissioners to lay down on the drafts to be filed by them in the commissioners' offices of both counties the tracts through which the division line between the counties passed, to be there kept as a matter of record, and as the report of the said commissioners was to be final and conclu-

[Keller *v.* Young.]

sive, we are of the opinion that the draft and the report of said
commissioners must be taken as determining the location of the
tracts of lands through which said division line passes, for the pur-
poses of assessment and taxation.] We think that the legislature
intended that when this draft was filed and became a matter of
record, and when they made the report of the commissioners final
and conclusive, it was for the purpose of enabling the taxing offi-
cers of the two counties to ascertain the tracts of land which would
be properly assessable and taxable within the territorial limits of
each of the said counties, and to enable the owners of unseated
lands, by an examination of the record in either county, to ascer-
tain in which of the two counties their tracts would be properly
chargeable with taxes, and where they would be required to pay
the same. [This being our view of the law which is applicable to
the facts of this case, we are of the opinion that the assessment of
the 173 acres, part of the Peter Hahn tract in Clinton county, and
its sale by the treasurer of Clinton county in June 1868, conferred
no title upon the purchaser, and that the plaintiffs acquired no
title under said sale, although the lines and monuments found
upon the ground of the Peter Hahn survey would place these 173
acres on the Clinton county side of the division line. We there-
fore instruct the jury to find a verdict for the defendants."]

The verdict was for the defendants.

The plaintiff sued out a writ of error and assigned for error the
parts of the charge in brackets.

*W. H. Blair* and *S. R. Peale*, for plaintiffs in error.—Each
county may tax so much land as lies within it: Patton *v.* Long,
18 P. F. Smith 260. The act did not authorize a survey of tracts
of land, but merely required the report to give the warrantee
names along the division line. The act being to mark the boun-
dary of the counties could not operate for another purpose: Ellis
*v.* Hall, 7 Harris 292. They discussed the several Acts of As-
sembly in relation to marking the boundary between the two
counties.

*S. D. Ball* and *L. Linn*, for defendants in error, also discussed
the Acts of Assembly.

Mr. Justice MERCUR delivered the opinion of the court, May
10th 1875.

The facts necessary to an understanding of this case are sub-
stantially these: The county of Clinton was created out of parts
of Centre and Lycoming counties, by Act of 21st of June 1839,
P. L. 362. The language of the act, designating the line between
Centre and Clinton, was such as to produce uncertainty and give
rise to dispute. By the Act of 11th of May 1848, Pamph. L. 504,

[Keller *v.* Young.]

commissioners were appointed, whose duty it was "correctly to run, and mark distinctly, the boundary line or lines between said counties, agreeably to the Act of Assembly creating Clinton county, the report of the commissioners to be final and conclusive." The commissioners ran and marked the line; and made report thereof, with an accompanying draft, to the commissioners of the respective counties.

It was subsequently ascertained that there was a discrepancy between the draft or report made by the commissioners and the marks upon the ground of that portion of the line running from the waters of Beech creek to the west branch of the Susquehanna river. To remedy this, the Act of 28th of April 1857, Pamph. L. 332, appointed commissioners, "correctly to run and mark distinctly the boundary line between the said counties, from the west branch of the Susquehanna river to the waters of Beech creek, agreeably to the Act of Assembly creating Clinton county aforesaid; and the commissioners shall make out two drafts, giving the names of the warrantees, who are known along said division line; * * * and in case there should be any discrepancy between the drafts made by the commissioners and the marks on the ground, the former shall govern and be final and conclusive." These commissioners wholly failed to act, and the law became inoperative by its own limitation. Then, by the Act of 25th of February 1859, Pamph. L. 83, commissioners were appointed "correctly to run and mark distinctly the boundary line or lines between the counties of Centre and Clinton; and it shall be the duty of said commissioners to lay down on their drafts the tracts through which the lines may pass, agreeably to the Act of Assembly creating said counties, and the supplements thereto." They were further required "to make out three drafts, one of which shall be filed in the commissioners' office of each of said counties, and the other to be filed in the Surveyor-General's office, and there kept as a matter of record." The act further provided that "the report of the commissioners shall be final and conclusive." These commissioners, in the discharge of their duties, ran and marked the boundary line between Clinton and Centre counties, and made and filed the drafts required by the statute. In their report, they say "the surveys, as represented, are correct in the respective counties."

On this draft the whole of the Peter Hahn tract is laid down as situate in the county of Centre. The boundary line between the two counties is there represented as the eastern line of the tract. The boundary line, as actually run and marked on the ground, divides the tract and leaves a part of it, in the shape of a triangle, containing one hundred and seventy-three acres, in Clinton county. The courses and distances on the draft correspond with the marks on the ground.

[Keller v. Young.]

The plaintiffs claim title to the one hundred and seventy-three acres through a sale in Clinton county as unseated land. The defendants claim the whole tract through a like sale in Centre county.

The respective rights of the parties depend on the construction to be given to the Act of 1859, and the legal effect of the action of the commissioners under it.

It is contended, on the part of the defendants, that inasmuch as the statute made it the duty of the commissioners "to lay down on their drafts the tracts of land through which the lines may pass," and subsequently declares that "the report of the commissioners shall be final and conclusive," therefore the Peter Hahn tract shall, in law, be held and adjudged to lie on that side of the boundary line, which the draft shall indicate, although in fact a part of it lies on the other side.

Let us consider whether this view is correct.

The object of the Statute of 1859 was to ascertain the true location of the boundary line between the two counties. The marks on the ground were in conflict with the courses and distances indicated on the draft. The statute did not contemplate any line of separation different from that designated by the Act of 1839. It did not authorize any territory to be added to, or to be taken from, either of the original counties, not named in the act creating the county of Clinton. Commissioners had previously located the boundary line. Their return of survey did not agree with their work on the ground. The Act of 1859 sought to remove that discrepancy. Like former acts, it directed the commissioners "correctly to run and mark distinctly the boundary line." It was hoped their marks on the ground would agree with the courses and distances which they described on the draft to be returned with their report.

The language appears to have been intentionally changed from the Act of 1857, under which no action was taken. The Act of 1857 appears to assume that the two might still vary. If so, the marks on the ground should yield to the courses and distances laid down on the drafts. The Act of 1859 gives no such controlling effect to the draft; but suppose it did, what then? It says the report shall be conclusive. Conclusive of what? Manifestly of no more than of the correctness of the courses and distances declared in their report, of which the draft was to form a part. The courses and distances represented on the draft filed by the last commissioners are not in conflict with their work on the ground. Both agree. The one has no preference over the other. It is the tract of land which is made to interfere with both, but its actual location on the ground cannot thereby be changed.

The commissioners were "to lay down on their drafts the tracts of lands through which the lines may pass." This was to facilitate

[Keller *v.* Young.]

the finding of the county line. It gave no power to change the line of any tract of land, nor to move its corners. The commissioners were not authorized to re-locate any tract of land, nor to decide on which side of the county line any tract might lie. To them was given no judicial power beyond locating the boundary line, and establishing evidence thereof on the ground and in their report.

The third section of the Act of 13th of June 1836, relating to public roads, declares the viewers appointed to lay out the same shall "annex and return to the court a plot or draft thereof, stating the courses and distances, and noting briefly the improvements through which it may pass." Has any one ever contended that the action of the viewers, in noting improvements, could transfer land to a side of the road different from the courses and distances on the draft, and the concurrent marks on the ground established it? In that case the object is the location of the road. In the case now under consideration, the object was the ascertainment and correct designation of the boundary line between the two counties. In the case of a road, the report becomes final and conclusive on confirmation by the court. In this case it was so made without any such confirmation. In either case, the noting of the improvements is merely directory, and cannot affect the actual location of the line, nor change, for any purpose, the land situated on either side. The learned judge, therefore, erred in instructing the jury to find a verdict for the defendants.

Judgment reversed, and a *venire facias de novo* awarded.