# W. P. Thompson *v.* W. P. Zartman Lumber Company, Appellant.

*Land law—Boundaries—Warrants—Surveys—Evidence.*

1. Where in an action of trespass for the wrongful cutting of timber, the case turns upon the location of a particular line and the location of this line depends largely on oral testimony, the question involved must be submitted to the jury.

2. Where in an action of trespass for the wrongful cutting of timber it appears that the essential fact to be ascertained is the true location of the northern boundary line of an ancient survey, and it also appears that the defendant has offered evidence as to the location of the southern boundary it is not error for the court to reject evidence of marks found along interior property lines which must have been made long after the original surveys.

3. Where in such a case the defendant introduces a connected draft of three ancient surveys certified from the land office and showing immediately beneath the tracts the words "Tuscarora Mountain," and "Cumberland County Line," the plaintiff may introduce in rebuttal acts of assembly defining the county boundaries, and reports of commissioners appointed to lay them out, to show the location of the county line referred to in the draft.

4. Where defendant introduces a connected draft of old surveys for the purpose of illustrating and making more easily understood the testimony of the witnesses, the plaintiff may in rebuttal introduce a similar draft for the same purpose, if it appears from the testimony that one draft was as well surveyed out as the other.

5. Where a connected draft of several surveys certified from the land office shows in its margin beneath the southern line of the tracts the words "Tuscarora Mountain" and "Cumberland County Line," these words will be construed as indicating that the southern line of

the survey was the Tuscarora Mountain and the county line; this on the principle that the name of a warrantee or owner written by the surveyor immediately outside the draft of a new survey, is a call for the lands of that warrantee or owner as an adjoinder.

6. Where ancient surveys call for the summit of a mountain as a boundary line, the court may say as a matter of law that the summit of the mountain is the legal boundary line, but if the evidence is conflicting as to the line which was actually the summit of the mountain, the location of the line must be determined by the jury.

7. Where on a trial 118 years from the time of the location of a survey, when time may have obliterated many of the original monuments, and death removed all of the actors of that day from the scene, slight evidence of marks found upon the ground corresponding with the survey returned, should have great weight in fixing the location of the survey.

8. Courses and distances and calls for adjoinders must give way to the marks made by the surveyor on the ground.

9. The location of a county line by state commissioners, and the recognition by property owners that such line was the southern line of a block of surveys, is not conclusive where there is evidence that the two lines did not coincide.

10. A call for a stream flowing to or across a boundary line must be considered by the jury in determining the location of a survey, but it has not the same conclusiveness as a call for a stream as a boundary.

*Practice, C. P.—Trial—Charge—Omissions or mistakes.*

11. Inadvertent mistakes or omissions in reviewing the testimony should be called to the attention of the court before the case goes to the jury, so that the error, if there is one, may be corrected before it has done any harm.

*Trespass—Cutting timber—Evidence—Qualification of witness.*

12. In an action to recover damages for the wrongful cutting of timber, a witness may testify as to the value of the timber, where he has previously stated that he lived near the land where the timber was cut, that he had been in the business of buying and cutting timber for twenty-eight years, that during several years he had been engaged to estimate the value of lumber land for others, that he had walked over the whole of the tracts in question, counted the stumps, saw their size, and the kind of timber, and figured from that and the surrounding timber that stood on the tract adjoining.

Argued March 11, 1913.   Appeal, No. 25, March T., 1913, by defendant, from judgment of C. P. Juniata Co., Sept. T., 1909, No. 88, on verdict for plaintiffs

in case of W. P. Thompson et al. v. W. P. Zartman Lumber Company. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ. Affirmed.

Trespass to recover damages for the wrongful cutting of timber on twenty-one acres of land in Turbot township. Before SEIBERT, P. J.

At the trial it appeared that the case turned upon the location of the southern line of the William Stewart survey, and the northern line of the James Ramsey survey. The facts relating to these surveys are stated in the opinion of the Superior Court.

H. J. Shellenberger and John Carney were offered as witnesses by the plaintiff to testify as to the value of the timber cut. After they had been examined as to their qualification, the court permitted them under objection and exception to testify as to value. [1, 2].

When W. F. McCahan, a witness for defendant, was on the stand, he was asked this question:

"Q. Now how did you find this subdivisional line of the Klugh between the Boyer and the Kohler? A. Well, it was well marked. Q. What did you find at this point?"

Mr. Hoopes: We object to the evidence of these subdivisional lines. They are interior lines of the original warrants and it is incompetent, irrelevant and immaterial.

The Court: We cannot tell at this time whether this evidence is relevant or not. We assume that it is as they are putting it in.

Mr. Neely: We go further: We show that the well-marked corners of these subdivisional tracts are on the north line of the Klugh and these other warrants being the recognized corners of the owners of the tracts.

Mr. Hoopes: Objected to. Make an offer.

Mr. Barnett: Counsel for the defendant offers to prove by the witness on the stand, a surveyor who has gone over the ground, the lines and the marks upon the

lines of subdivision of the Ramsey, Klugh, Jackson and Huston tracts for the purpose of tieing those lines between the northern straight boundary line and the southern boundary line, and marks upon the respective northern and southern boundary lines, for the purpose of establishing the main northern boundary line of the plot surveying the northern boundary line of the Ramsey tract.

Mr. Hoopes: Objected to as immaterial, irrelevant and incompetent until the evidence shows that there are original marks upon any lines of any tract in this block by which this north line can be determined from the original survey.

The Court: Objection is overruled and evidence admitted for the purpose offered. If it fails to be connected with other marks which will indicate the ancient character of this line, of course, the court will, on motion, strike it out.

An exception noted for the plaintiffs.

"Q. Now, Mr. McCahan, how was this line——"

The Court: But I don't see, Mr. Neely, how these subdivisional tracts, the second subdivision, would be important.

"Q. How did you find the line between the Boyer and the Kohler marked here? A. There was a well-marked line between the Boyer and the Kohler."

Mr. Pennell: Is it a subdivisional line?

Mr. Neely: Yes, sir.

Mr. Pennell: Objected to because it is irrelevant, immaterial and incompetent, being a subdivisional line of the original tract, or warrant, or survey.

Mr. Neely: How was that line indicated on the ground, I mean the line between the Boyer and the Kohler, because I want to arrive at the southwest corner of the tract?

The Court: You don't refer to the divisional line between north and south?

Mr. Neely: Yes, I do.

The Court: It seems to me you get into an infinitude of detail here.

Mr. Neely: My purpose is to show the witness what he found at the southeast corner of the Boyer tract on the southern line of the Klugh.

Mr. Pennell: Then you have withdrawn the other question?

Mr. Neely: No, I think that is right because he must lead to this point by a well-marked line.

Mr. Hoopes: Objected to, and ask it to be stricken out.

The Court: The court will confine you to marks along the northern line and southern line of the survey and cut out the intermediate lines. An exception noted for the defendant. [3]

Mr. Pennell: We now offer in evidence the act of assembly authorizing the commissioners to run the county line between Perry and Juniata counties, it being the Act of April 2, 1860, found in Pamphlet Laws of 1860, page 529.

Mr. Barnett: Objected to as irrelevant and immaterial.

Mr. Pennell: We offer it for the purpose of showing the authority of the commissioners to run the county line, to be followed by the report of these commissioners as found on file in the prothonotary's office, in Juniata county, for the purpose of locating the Juniata county line as it was run in pursuance of this act of assembly, to show the difference between the county line as it is run now on the mountain, and the tract line as we contend it, is, south tract line. Also for the purpose of enabling the jury to determine the true tract line.

Mr. Barnett: Objected to as irrelevant and immaterial and inadmissible for the reason that the act of assembly does not, in any way, tend to locate the line upon the ground, and the only materiality the county line has in this case is as a possible monument for the purpose of locating the boundaries of these tracts, and its value for that purpose depends upon its discovery and loca-

tion upon the ground by the surveyors in endeavoring to locate the tract and where the trees were they found and claimed to be the line, is not material in this case for the reason that the Ramsey and other tracts in the block with the Ramsey, do not even call for the county line as an adjoiner or boundary. Also object because both the act of assembly and survey of the county line, under it, are more than half a century later in date than the original survey of the tracts in question.

The Court: Mr. McCahan, the surveyor, adopts the county line and ties it to this survey.

Mr. Hoopes: The title papers call for the county line as the southern line for this Ramsey tract.

The Court: Objection overruled, evidence admitted, and an exception noted for the defendant. [4]

Mr. Pennell: We also offer the report of the commissioners, fixing the county line between Juniata and Perry counties, filed in the prothonotary's office in Juniata county on August 13, 1860.

Mr. Barnett: Objected to as irrelevant and immaterial, and for the last reasons given.

The Court: We make the same ruling and note the exception for the defendant. [5]

Mr. Pennell: We offer in evidence draft prepared by Mr. Burchfield, identified as plaintiff's exhibit No. 1, April 29, 1912.

Mr. Barnett: Objected to as incompetent and inadmissible for the reason that the draft contains lines never run by a surveyor, who made the draft, as to which he cannot testify and has not attempted to testify, and shows upon the draft an assumed county line not shown upon the original certified draft from which this draft purports to be any part taken and, therefore, there is nothing authoritative in the draft, and it is not covered entirely by testimony, and parts of it are not covered by testimony in such a way that the uncovered portions can be excluded from the consideration of the jury.

The Court: Objection overruled, evidence admitted and an exception noted for the defendant. [6]

Mr. Pennell: Also offer in evidence the act of assembly dated September 19, 1789, 2 Smith's Laws, 493, it being an act for erecting certain parts of Cumberland and Northumberland counties into a separate county.

"Second Section. Be it enacted, and it is hereby enacted by the representatives of the freemen of the Commonwealth of Pennsylvania, in General Assembly met and by the authority of the same, that all and singular lands lying within the bounds and limits hereinafter described and following, shall be and are hereby erected into a separate county, by the name of Mifflin County, namely; Beginning at the Susquehanna River, where the Turkey Hill extends to the said river, thence along the said hill to Juniata, where it cuts Tuscarora Mountain, thence along the summit of the said mountain to the line of Franklin County, thence along the said line to Huntingdon County, thence along the said line to Juniata River, thence up the said Juniata River to Jack's Narrows, thence along the line of Huntingdon County to the summit of Turkey's Mountain, thence along the line of Huntingdon and Northumberland Counties, so as to include the whole of Upper Bald Eagle Township, in the county of Northumberland, to the mouth of Buck Creek, where it empties into the Bald Eagle Creek, thence to Logan's Gap, in Nittany Mountain, thence to the head of Penn's Creek, thence down said creek to Sinking Creek, leaving George McCormick's in Northumberland County, thence to the top of Jack's Mountain, at the line between Northumberland County and Cumberland, thence along the said line to Shure's Spring, at the head of Mahantongo Creek, thence down the said Creek to Susquehanna River, and thence down the said river to the place of beginning."

Mr. Pennell: That is the section to show that the summit of the mountain was the county line between Cumberland and Mifflin county.

The Court: What materiality has that?

Mr. Pennell: This tract, to go to the summit, has to go thirty-five rods from where it is.   We are bound to show where it was to go.

Mr. Barnett: Objected to, because it is irrelevant and immaterial and not connected in any way with any testimony in this case, and not capable of affording the jury any light, except a haphazard and uncertain method · of determining any of the southern lines in question.

The Court: Objections overruled, evidence admitted, and an exception noted for the defendant. [7]

Plaintiff presented these points:

1. The words "Cum'b. Co. Line" written by the deputy surveyor on the drafts of the Robert Smith and William Huston surveys a short distance from the south line of those tracts, mean that the Cumberland county line at the time those surveys were made was the southern line of these two tracts. *Answer:* This point is affirmed.   Words so placed upon the margin of a draft made by a deputy surveyor as a map of his survey, locating a warrant, are part and parcel of the survey, and indicate adjoiners and adoption of the lines of such adjoiners, as do the calls for trees and other objects indicate corners or lines upon the ground. [8]

2. The summit of the Tuscarora Mountain at the place where the Robert Smith and William Huston tracts are located was the Cumberland county line in the year 1794. *Answer:* This point is affirmed.   By the act of September 19, 1789, the county of Mifflin, now Juniata, was divided from the county of Cumberland, and that act made the summit of the Tuscarora Mountain the line of division.   James Harris, deputy surveyor at the time, surveyed the Robert Smith tract August 20, 1794, and the William Huston tract August 21, 1794; it seems this division line was not actually run upon the ground, but the deputy surveyor having adopted the "Cumberland County Line" of 1794, as the southern line of these tracts, then their southern boundary was

"the summit of the Tuscarora Mountain," the exact location of which, with reference to these Smith and Huston tracts, is to be determined by the jury under all the evidence in the case. [9]

3. The south line of the Robert Smith and William Huston tract, according to the original surveys made in 1794, being the Cumberland county line, that south line must now be located on the summit of the Tuscarora Mountain. *Answer:* This point is affirmed. But while the "summit of the Tuscarora Mountain" is the legal boundary line of the two surveys mentioned in this point, it has an element of uncertainty about it, and the jury must determine its location as the southern boundary line of these surveys with certainty as the evidence in the case may convince the minds of the jury it actually is upon the ground. [10]

7. The south line of the Samuel Jackson, Henry Klugh and 116 rods of the James Ramsey tract being an eastern extension of the south line of the Robert Smith and William Huston tract and there being no proof of original marks anywhere along the north line of any of these tracts to control the distance called for in the drafts returned by the deputy surveyor, the north line of these surveys must be located at the end of the official distance called for in these drafts. *Answer:* This point is affirmed, provided the jury finds under all the evidence that there is no proof of original marks, or perpetuations thereof, anywhere along the north line of any of these tracts. The Samuel Jackson and Henry Klugh surveys calling for no adjoiners on the north, and the James Ramsey survey calling for an indefinite northern adjoiner, to wit: "Near Benjamin Kepler," if there be no evidence of original marks along their northern line, or perpetuations of such original marks, then the official distances of the survey returned to the land office must govern, and these distances must determine the northern extent of these several tracts. [11].

8. If the county line between Juniata and Perry

counties, as run and now marked upon the ground, are the present county line, between those counties, does not agree and coincide to the south line of the Robert Smith and William Huston tracts, and the extension of that line along the south side of the Samuel Jackson, Henry Klugh and the west end of the James Ramsey tract, as originally surveyed, it does not constitute the true southern boundary line of these tracts, even although it may have been considered and recognized as such by some of the property owners along it for the last sixty or seventy years. *Answer:* This point is affirmed unless the jury shall find, under all the evidence, that the recognition of such line by adjoining property owners was because of original marks upon the ground, or marks that were perpetuations of such original marks, inducing such recognition. [12]

9. If the jury find as a fact, from the evidence in the case, that the north line of the Robert Smith, William Huston, Samuel Jackson, Henry Klugh and James Ramsey tracts, as testified to by defendant's witnesses, is more than the distance called for in the original surveys of said tracts, from the south line of those tracts, as fixed by the William Huston and Robert Smith tract on the summit of the mountain, then in the absence of evidence of any original marks of the north line of these tracts on the ground, or any evidence of any marks in perpetuation of said original marks, this north line as testified to by the defendant's witnesses is not the true north line of said tract. *Answer:* Affirmed, provided the jury find the facts to be as stated in the point; and the jury is requested to carefully consider and weigh all the evidence in the case which relates to any, each and all of the facts referred to in this point. [13]

10. The relocating or changing of the county line by any subsequent regularly authorized commission or other method, will not change the location of any tract of land which calls for the county line as a boundary, nor will such relocating or changing of the county line change

312 THOMPSON *v.* ZARTMAN LUM. CO., Appellant.

Statement of Facts—Charge of Court below.    [55 Pa. Superior Ct.

the line of such tract nor remove its corners nor decide on what side of the relocated county line said tract may lie. *Answer:* This is affirmed. As stated in the answer to the plaintiff's second point, the act of September 19, 1789, dividing the county of Mifflin, now Juniata, from the county of Cumberland, fixed the boundary line between the two counties as "the summit of the Tuscarora Mountain;" by an Act of Assembly, passed April 14, 1834, P. L. 404, three commissioners were appointed to run and mark the division line between the counties of Juniata and Perry, and they did so; then for some reason not now apparent, the legislature passed the Act of April 2, 1860, P. L. 529, also appointed three commissioners to run the line between the counties of Juniata and Perry from the Juniata river to the Franklin county line, which they did, and so far as anything in this case goes to show, these commissioners of 1860 located the line south of the Ramsey, Klugh, Jackson, Huston and Smith surveys and practically in the same place as did the commissioners under the act of 1834. Now, if you find, under all the evidence, that the division line of 1787, between Cumberland and Mifflin, now Juniata, counties, was the true south line of the Ramsey, Klugh and other tracts mentioned, then, if the division lines between the counties of Perry and Juniata ran, in 1834, and in 1860, made any change from the old division line between the counties of Cumberland and Mifflin, now Juniata, such change will not alter the location of any tract of land which had for one of its boundaries the Cumberland and Mifflin, now Juniata, division line. [14]

The court charged in part as follows:

[Of original landmarks none appear to remain along the line of either tract; they seem to have disappeared through the long lapse of years, and it is for you to find whether or not there are now upon the ground perpetuations of such vanished original, and if you find there are such perpetuations, then in the determina-

tion of this question you should be governed by them. We recall no evidence of any landmarks along the lines of either the Stewart or the Ramsey tract counting back to near about the dates of survey; the Spanish oak on one of the lines of the Stewart survey, according to the testimony of the surveyor, Mr. Cooper, only blocks back seventy-eight to eighty years, to 1832, twenty-one years after the survey was made; the rock oak block from trees along the alleged northern line of the Klugh, Jackson and Huston, and possibly other surveys, according to the testimony of the defendant's surveyors, W. F. McCahan, J. Frank Patterson and S. W. Cooper, only count back sixty or sixty-five years, say back to 1847, or fifty-three years later than the markings of the survey and locating it on the ground under the Ramsey warrant.

Because of the seeming absence of original landmarks along the lines of the Stewart and Ramsey surveys, evidence was admitted relating to lines and landmarks of the block survey of the Klugh, Jackson and Huston, of which block the Ramsey was a part, surveys and adjacent and contiguous other surveys, for the purpose of allowing the proof of the present existence of some reasonably certain landmarks.] [16]

Verdict and judgment for plaintiff for $1,008. Defendant appealed.

*Errors assigned* were (1–7), rulings on evidence, quoting the bill of exceptions; (8–16) above instructions, quoting them.

*J. Howard Neely* and *James M. Barnatt,* for appellant.— The jury are entitled to the benefit of witnesses of skill and judgment, who have had opportunities to learn the value of similar properties in the same neighborhood and all persons, who, whether as real estate agents or as private parties have been engaged in buying or selling similar property in the same neighborhoood are

competent to express an opinion as to the market value of the land: Kellogg v. Krauser, 14 S. & R. 137; Brown v. Corey, 43 Pa. 495; Pennsylvania & New York R. R. Co. v. Burnell, 81 Pa. 414; Rees v. Schuylkill River E. S. R. R. Co., 135 Pa. 629; Jones v. Erie & Wyoming Valley R. R. Co., 151 Pa. 30; Lewis v. Springfield Water Co., 176 Pa. 237.

Where surveys are made and returned into the land office in blocks, they are to be located on the ground in blocks: Hagerty v. Mathers, 31 Pa. 348.

The marks on any part of a block of surveys belong to each tract of the block; and a tract of a block may be located by marks on the ground by other tracts of the block: Malone v. Sallada, 48 Pa. 419; Eister v. Paul, 54 Pa. 196; Pruner v. Brisbin, 98 Pa. 202; Mathers v. Hagerty, 37 Pa. 64; Northumberland Coal Co. v. Clement, 95 Pa. 126.

To the commissioners was given no judicial powers beyond locating the boundary line and establishing evidence thereof on the ground and in their report. They were not authorized and had no power nor was it their purpose to determine the boundary lines of any tract of land: Keller v. Young, 78 Pa. 166; Pardee v. Orvis, 103 Pa. 451.

The act of commissioners in laying out a county line cannot affect vested rights: Beale v. Patterson, 3 W. & S. 379; Hecker v. Sterling, 36 Pa. 423.

*F. M. M. Pennell* and *Will L. Hoopes*, for appellees.— The general rule of evidence is, that in questions of science, skill, trade, or others of the like kind, persons of skill, sometimes called experts, may not only testify to facts, but they are permitted to give their opinions in evidence: Mish v. Wood, 34 Pa. 451; Detweiler v. Groff, 10 Pa. 376; Canfield v. Johnson, 144 Pa. 61; Worden v. Connell, 196 Pa. 281; Ardesco Oil Co. v. Gilson, 63 Pa. 146; Com. v. Gibbons, 3 Pa. Superior Ct. 408; Delaware & Chesapeake Steam Towboat Co. v. Starrs, 69 Pa. 36.

The words "Cumberland county line" on the draft of the Huston tract, would indicate that the county line was the south line of that tract: Salmon Creek Lumber & Mining Co. v. Dusenburry, 110 Pa. 446; Beale v. Patterson, 3 W. & S. 379.

The act directing county lines to be run does not give the commissioners authority to relocate any tract of land, nor to decide on which side of the county line any tract might lie: Keller v. Young, 78 Pa. 166; Pardee v. Orvis, 103 Pa. 451.

Courses and distances make the survey where the lines on the ground are not be found, except in calls for adjoiners: Boynton v. Urian, 55 Pa. 142; Green v. Schrack, 16 Pa. Superior Ct. 26; Wharton v. Garvin, 34 Pa. 340.

A judgment will not be reversed for a slight inaccuracy in a portion of the charge, when the case was otherwise fairly presented and the testimony adduced showed that the error was harmless: McCahan v. Wharton, 121 Pa. 424; Commonwealth v. Razmus, 210 Pa. 609; Medis v. Bentley, 216 Pa. 324; Yerkes v. Wilson, 81* Pa. 9.

OPINION BY RICE, P. J., October 13, 1913:

In this action of trespass the plaintiffs sued to recover treble damages for cutting and converting timber upon a tract of land containing twenty-one acres. They claimed title under a warrant issued to William Stewart, and the defendant claimed title under a warrant issued to James Ramsey. The Stewart warrant was dated July 31, 1794, and the survey thereunder was made on March 19, 1811, and returned on July 16, 1813. The Ramsey warrant was dated January 21, 1794, and the survey thereunder was made on April 15, 1794, and returned on July 12, 1794.

It is undisputed that the twenty-one acres are included within the lines of the Stewart warrant and survey, but the defendant contended that, to that extent, these

overlapped the Ramsey on the north, and that, as the Ramsey warrant, survey, and return were prior in time, the defendant has the paramount title. The plaintiffs denied that there was such overlap or interference Therefore, the primary question on the trial was the location of the northern line of the Ramsey survey. This question was submitted to the jury with explicit instruction that, before a verdict could be rendered for the plaintiffs, they must be convinced, by the weight of the evidence, that the timber was cut north of that line. The evidence relating to this question was complicated and voluminous. It is comprehensively reviewed by the learned trial judge in his opinion overruling the defendant's motion for new trial. We shall not go over the ground again, except so far as may be necessary in discussing some of the assignments of error. It is proper to say, at the outset, that the location of the line in dispute depended largely upon oral testimony, and therefore the question was necessarily submitted to the jury. Our province is not to determine whether their conclusion was right or wrong, but whether substantial errors were committed either in the instructions under which it was submitted or in the admission or rejection of evidence.

In the third assignment of error complaint is made of the refusal to permit the defendant to prove by W. F. McCahan, a surveyor, the length and markings of subdivisional lines running from the northern contested line and its protraction, to the southern boundary of the block containing the Ramsey tract. As explained in the brief of counsel, and as shown by the notes of testimony, the defendant's intention was to show the landmarks and monuments on the lines between the Boyer and Kohler tracts, these being subdivisions of the Klugh tract, which was one of the tracts embraced in the Ramsey block of surveys. It also appears by the cross-examination of the witness, that he found no original marks on any of these subdivisional lines. When

it is remembered that the fact to be ascertained was the true location of the northern boundary line, and that the defendant was permitted to show the marks along what it claimed to be this line, as well as along what it claimed to be the southern boundary of the surveys, it becomes apparent that no error was committed in rejecting evidence of marks found along interior property lines which must have been made long after the original surveys. The offered evidence had no apparent relevancy to the question for decision, and its admission would have tended only to burden the minds of the jurors with unimportant details and thus obscure the true issue.

The fourth, fifth, and seventh assignments of error may be considered together. They relate to the admission of the following documentary evidence: a. The act of September 19, 1789, 2 Sm. Laws 493, erecting the county of Mifflin out of parts of the counties of Cumberland and Northumberland, and designating one of its lines as being "along the summit of Tuscarora mountain;" b. The Act of April 2, 1860, P. L. 529, authorizing commissioners to run the county line between Perry and Juniata counties; c. The report of the commissioners appointed under this act. In connection with these assignments it should be stated that Perry county was erected out of part of Cumberland in 1829, and Juniata county was erected out of part of Mifflin in 1831, and that the line spoken of in the act of 1789, as being along the summit of Tuscarora mountain, is now the line, or near the line, between Perry and Juniata counties. It is stated in the opinion of the learned trial judge, and seems to be undisputed, that this division line between the two counties was first run and marked by commissioners authorized so to do by the Act of April 14, 1834, P. L. 404, and that the commissioners appointed under the act of 1860 located the line in practically the same place. While, as we have said, the controlling question in the case was as to the location of the northern line of the Ramsey tract, it was concededly relevant and material,

in the determination of that question, to prove the true location of the southern boundary of the tract. For the purpose of locating the tract, the defendant offered in evidence a connected draft certified from the land office, showing the Ramsey, Klugh and Jackson tracts, all of which were surveyed on the same day, and the Huston, adjoining the Jackson on the west, which was surveyed in the same year. The defendant also offered in evidence a connected draft (defendant's exhibit "B") constructed by its surveyors, who had been witnesses in the case, showing the above four tracts, and, in addition, the William Smith adjoining the Huston on the west. This draft was offered and admitted merely for the purpose of illustrating and making more easily understood the testimony of the witnesses for the defendant as to the lines in controversy in the case. With the exception of a slight jog in the line of the Ramsey, the southern line of all the tracts exhibited by these drafts is a continuous straight line. On the certified draft, immediately beneath each of the first three tracts, appear the words "Tuscarora Mountain," and immediately beneath the

                                          " Vact "

Huston tract are the words "Cum. Co. Line." The separate certified draft of the Ramsey survey in like manner calls for "Tuscarora Mountain" on the south, and of the Smith survey for "Line of Cum'd. County."

                                          " Vact "

In view of these calls for the Cumberland county line and Tuscarora mountain in the official papers offered in evidence by the defendant, there can be no doubt of the relevancy of the act of 1789 by which this line was established. But it was specifically objected against the admission of the act of 1860 and the action of the commissioners appointed under it, that these were long after the date of the original surveys of the tracts in question. In considering this objection it is to be noticed that the evidence objected to was admitted, not in the presentation of the plaintiffs' case in chief, but

in rebuttal and after Mr. McCahan, the defendant's surveyor, had testified that in locating the southern line of these tracts he ran along the county line "as it is now." It is sufficient to say, without going into an extended recital of his testimony, that it is fairly inferable therefrom that the southern line of these tracts as run and determined by him was coincident, or nearly so, with the county line as run and marked in 1834 and adopted by the commissioners appointed to run and mark the line in 1860. The defendant having thus introduced that line into the case, it was clearly competent for the plaintiffs in rebuttal to introduce the report of the commissioners for the purpose, if for no other, of showing where they located the line. When the learned judge said, in overruling the objection, "Mr. McCahan, the surveyor, adopts the county line and ties it to this survey," he clearly and concisely indicated a valid and sufficient ground for his ruling.

Complaint is made in the sixth assignment of error of the admission of a draft prepared by the plaintiffs' surveyor showing the location, as claimed by the plaintiffs, of the Ramsey, Klugh, Jackson, Huston and Smith tracts. This draft was of the same nature as defendant's exhibit "B," to which we have alluded, and as said by the learned judge, in his opinion overruling the motion for new trial, it was, according to the testimony, fully as well surveyed out as the latter. We are of opinion that both were properly admitted in evidence, not as independent proof but for the purpose of illustrating and making more easily understood the testimony bearing upon the conflicting contentions of the parties as to the lines involved in the case.

The plaintiffs' points which are referred to in the eighth, ninth, tenth, eleventh and thirteenth assignments of error may be summarized as follows: The words Cumb. Co. Line on the drafts of the Robert Smith and William Huston tracts indicate that the Cumberland county line at the time these surveys were

made was the southern line of these two tracts; the summit of Tuscarora Mountain at that place was the Cumberland county line in 1794; the southern line of these two tracts must now be located on the summit of Tuscarora mountain; the southern line of the Samuel Jackson, Henry Klugh and 116 rods of the James Ramsey being an eastern extension of the southern line of the Robert Smith, and there being no proof of original marks along the northern line of any of these tracts to control the distance called for in the drafts returned by the deputy surveyor, the northern line of these tracts must be located at the end of the official distance called for in the drafts. These points and the answers to them are closely connected in logical sequence and will be considered as a connected whole. It is not perceived what other purpose the deputy surveyor could have had in writing the words Cumb. Co. Line in the place they appear upon the drafts of his survey of the two tracts mentioned than to indicate that their southern line was the county line. According to the doctrine of Salmon Creek Lumber & Mining Co. v. Dusenbury, 110 Pa. 446, the name of a warrantee or owner written by the surveyor immediately outside the draft of a new survey is a call for the lands of that warrantee or owner as an adjoiner. For the same reason the words Cumb. Co. Line were correctly interpreted by the trial judge as a call for that line. Equally well suported by reason and authority was his affirmance of the proposition that the summit of Tuscarora mountain at the place involved in this litigation was the Cumberland county line in 1794, but as pointed out by the Supreme Court in Beale v. Patterson, 3 W. & S. 379, where this very county line was under consideration, there is an element of uncertainty in the determination of the precise location of the line which the legislature designated as being along the summit of Tuscarora mountain. This difficulty and the solution of it are thus indicated in the following excerpt from the opinion of the court in that

case: "When dividing the counties of Mifflin and Cumberland, the legislature must have been under the impression that the Tuscarora was a continued and uninterrupted range of mountains; and for this reason it was supposed to be a sufficiently certain designation of boundaries to divide them by a line running along the summit of the mountain, from a given point, to the Franklin county line. In this, it seems, they were mistaken; and hence, to ascertain the division, some rule must be adopted; and we think the court has hit upon the true one. When the mountains pass each other, forming an intervening valley between the two, upon the one side of which the mountain is gradually sinking and terminating, and on the other the mountain is commencing and rising, a line from one to the other at or about the place where the respective mountains acquire an equal height, is the legal dividing line." It is earnestly urged by appellants' counsel that the case of Beale v. Patterson is not pertinent to the present issue as presented by the testimony and that the division line of the two counties, indefinite, unsurveyed and unmarked, cannot serve to locate a line of a survey in 1794 "in a locality like the Huston tract where the mountain widens out into a table-land." It is contended by the plaintiffs, on the other hand, that there is no table-land between the two ridges but a hollow of considerable depth, and there is some evidence tending to sustain the latter contention. It must be conceded, as it was in the case cited, that the question of the true location of the Cumberland county line is not free from difficulty. But after careful consideration of the elaborate arguments of counsel upon this question and of the evidence as to the topography of the region involved, we are not convinced that under no view which the jury could take of it is the rule laid down in Beale v. Patterson applicable to the facts developed on the trial. On the contrary, our conclusion is that the defendant had no just cause to complain of the court's

instruction that while the summit of Tuscarora mountain is the legal boundary line of the two surveys above mentioned, yet it was for the jury to determine from the evidence in the case where it is actually located on the ground. We can discover no stable ground upon which a withdrawal of that question from the consideration of the jury could have been justified. . This brings us to the last branch of the proposition covered by the points under consideration, namely, that the northern line of the Samuel Jackson, Henry Klugh and James Ramsey tracts must be located at the end of the official distance called for in the returns of survey, i. e., at the end of the official distance from the Cumberland county line. The bare affirmance of the points relative to the effect to be given to the official distance called for in the returns of survey, would have been erroneous and misleading if that were all that was said upon the subject. But it was not all that the court said. In his general charge the learned judge instructed the jury correctly, clearly and with painstaking elaboration as to the relative importance to be attached to monuments or marks on the ground, calls for adjoiners, and courses and distances in determining a dispute as to the true location of the tract. In accordance with well-settled principles he told the jury explicitly that both courses and distances and calls for adjoiners must give way to the marks made by the surveyor on the ground. Again, by affirming the defendant's seventh point he also instructed the jury that in a trial 118 years from the time of the location of a survey, when time and the hand of man may have obliterated many of the original monuments, when death has removed the actors of that day from the scene, and when evidence of a transaction so ancient must necessarily have ceased in a large measure to exist, slight evidence of marks found upon the ground corresponding with the survey returned ought to have great weight in fixing the location of the survey. The learned judge also affirmed another point presented by

the defendant which was to the effect that the testimony as to the location of the southern line of the Ramsey, Klugh, Jackson and Huston surveys, and of the county line, was material only in so far as it might aid the jury in fixing the northern boundary of the Ramsey tract, and that if they were satisfied that the northern line of those surveys, as testified by the defendant's surveyors and other witnesses, was the true line, no doubt as to the location of the southern line or the county line could operate to change the northern line as so fixed and marked upon the ground. Finally, in his answer to the points directly under consideration, he instructed the jury to the effect that the official distance would control in the location of the northern line only in the contingency of their finding "that there was no proof of original marks or perpetuations thereof anywhere along the northern line of any of these tracts." Considering the answers to the points embraced in these five assignments of error in the light of the evidence and of the instructions that had been given in the general charge, and in the answers to the defendant's points, we conclude that they contain no error but were in accordance with well-settled legal principles.

The questions raised by the twelfth and fourteenth assignments of error are as to the effect to be given to the location of the county line by the commissioners appointed under the act of 1834 and 1860, and to the evidence relating to the recognition of that line by property owners. Under the former act the commissioners were appointed "for the purpose of running and marking a line between the counties of Perry and Juniata, agreeably to the laws dividing the counties of which they were formerly parts, which line when run and marked shall be the boundary line dividing the county of Perry from the county of Juniata." The authority of the commissioners appointed under the later act "was to survey, ascertain and mark the dividing line between the counties of Perry and Juniata, commencing at the

Juniata River and running thence to the Franklin county line." Obviously, neither of these acts gave the commissioners judicial powers beyond locating the boundary line and establishing evidence thereof on the ground and in their report; they were not authorized and had no power to determine the boundary line of any tract: Keller v. Young, 78 Pa. 166. Hence it seems clear, that if the county line, as run and marked on the ground by the commissioners, does not coincide with the southern line of the Smith and Huston tract and the extension of that line along the Jackson, Klugh and Ramsey tracts, as originally surveyed, it does not constitute the true southern boundary of those tracts. Thus far the answers to the points embraced in these two assignments are unquestionably right. How does the fact, if it be a fact, that it was considered and recognized as the true southern boundary line by some of the property owners along it for the last sixty or seventy years, affect the legal conclusion? We cannot see that it affects at all the vested rights of other property owners. Such recognition by many property owners through a long period of years may, after the original marks and monuments have been obliterated by time and the hand of man, be strong evidence even as against other property owners as to the true location of the line: Reilly v. Mountain Coal Co., 204 Pa. 270. But it cannot change it if it can be ascertained satisfactorily otherwise. This question as to the effect of usage in determining the location of the county line along the summit of Tuscarora mountain was considered in Beale v. Patterson, and it was there said: "As, then, in some respects, it may be viewed as indefinite and uncertain, the dividing line may be controlled by common usage, and by the assent of the authorities of the two counties. But this would require clear and explicit proof of uninterrupted usage and consent and can only be justified on the maxim, communis error facit jus. But, unhappily for the argument, there is no such evidence. The act

dividing the county was passed in 1789 and the warrant, which is the foundation of the defendant's title, was laid, and the survey made, in 1794, and at that time there was no usage whatever, which can in any way affect or alter the legal construction of the act." These remarks are pertinent here. We think it logically follows from the application of the doctrine of that case and of Keller v. Young that the court would have been justified in affirming the two points under consideration without qualification. Certainly, in affirming them with the qualification "unless the jury shall find, under all the evidence, that the recognition of such line by adjoining property owners was because of original marks upon the ground, or marks that were perpetuations of such original marks inducing such recognition," the defendants have no just cause to complain of the answers. Particularly is this true as in answer to other points the jury were instructed that if they found that there were perpetuations of original marks on the ground, then they should be governed by them.

In their argument on the fifteenth and sixteenth assignments of error appellants' counsel criticise the learned judge's statement in his charge that he could recall no evidence of any landmarks along the lines of either the Stewart or the Ramsey tract counting back to near the dates of survey. As the basis of this criticism, counsel point to the fact that there is laid down on the deputy surveyor's draft of the Ramsey tract a small stream apparently rising on the tract and flowing northwardly to or across its northern boundary line, and in connection with this fact they call attention to the testimony of the defendant's surveyors that they found on the ground a stream, or the bed of a stream, which, it is claimed, would correspond in location with the deputy surveyor's draft, if the defendant's contention as to the line be correct, but would rise, not on the Ramsey tract, but north of it, if the plaintiff's location of the line be adopted. The plaintiffs' counsel argue, on

the other hand, that this conclusion does not necessarily follow from a consideration of all the relevant facts, taking the Ramsey and the Stewart drafts in their relation each to the other, and that if the judge had specifically referred to the subject he would have been compelled to instruct the jury that the argument was rather stronger in favor of the plaintiff's contention than that of the defendant. The testimony of the defendant's surveyors is not very full nor very clear. One of them said, "It is a blind stream; it was a blind stream before the railroad was built." There is certainly room for argument that this indefinite testimony did not clearly identify the blind stream as the stream that the deputy surveyor laid down on his draft. Granting however the pertinency of the evidence and of the facts fairly deducible from it, we cannot agree with appellant's counsel that the court would have been warranted in charging the jury that the stream laid down on the Ramsey draft was a landmark which, under the defendant's testimony, would, standing alone, conclusively determine the true location of the northern boundary line of the Ramsey tract. Such call for a stream flowing to or across a boundary line must be considered by the jury in determining the location of the survey, but the value of the evidence depends on the circumstances: Pruner v. Brisbin, 98 Pa. 202. This idea is very clearly expressed in the portion of the charge of Judge· ORVIS, at page 206 of the report of that case. It has not the same conclusiveness as a call for a stream as a boundary. It is to be noticed further that in speaking of landmarks, in that portion of the charge which is quoted in the sixteenth assignment of error, the learned judge evidently had in mind and referred to the work of the surveyor of the ground, such as marking trees, and in that view of the charge it was not erroneous. Further, the charge cannot be construed fairly as a binding direction that the stream was not a landmark to be considered by the jury. As we have said,

the evidence was complicated and voluminous. Numerous facts were relied upon by the parties as sustaining their respective contentions. It is not a matter of surprise that in a long charge some of these, which counsel on the one side or the other would consider material and important, would be overlooked by the judge and not be specifically mentioned. The very words of the charge that are quoted indicated that he was speaking of his recollection of the evidence, and impliedly invited counsel to call his attention to any omission that they might deem material. The charge as a whole was a clear, comprehensive and impartial presentation of the issues of facts to be decided, and if there was omission to call attention to, or comment upon as fully as might be deemed desirable, specific facts or phases of the evidence, it was an inadvertency, which, if the judge's attention had been called to it, doubtless would have been corrected. The decisions are numerous, and are founded on just principles essential to the avoidance of undue expense and delay in the adjudication of cases, that inadvertent mistakes or omissions in reviewing the testimony should be called to the attention of the court before the case goes to the jury, so that the error, if there is one, may be corrected before it has done any harm. As to such inadvertent omission or mistake, it has been said, and we think the principle is applicable to these assignments, that "a party may not sit silent and take his chance of a verdict, and then if it is adverse complain of a matter which, if an error, would have been immediately rectified and made harmless:" Com. v. Razmus, 210 Pa. 609; Com. v. Minney, 216 Pa. 149; Medis v. Bentley, 216 Pa. 324; Slavin v. Northern Cambria Street Railway Co., 47 Pa. Superior Ct. 454; Com. v. Eaby, 52 Pa. Superior Ct. 619.

The two remaining assignments to be considered are the first and second. They relate to the competency of two witnesses called by the plaintiffs who testified as to the value of the timber cut from the tract in con-

troversy. These witnesses lived in the county and not many miles distant from the tract. One of them testified that he was a lumberman, that he had been engaged in the business of buying and cutting timber for twenty-eight years, and that during several years he has been engaged to estimate the value of lumber land for others. He further testified that he went on the tract, walked over the whole of it, counted the stumps, saw their size and the kind of the timber, and figured from that and surrounding timber that stood on the tract adjoining. The other witness also testified to several years' experience in estimating values and buying and selling timber. The testimony as to their qualifications is quite fully set out in the assignments of error, and need not be recited by us in greater detail. We recognize the principle laid down in the cases cited by appellants' counsel, that a witness should in some way and to some reasonable extent have in his mind the data from which a proper estimate of value ought to be made. If interrogated, he should be able to disclose sufficient knowledge of the subject to indicate that he is in a position to know what he proposes to state and to enable the jury to judge of the probable accuracy of his conclusion: Pittsburg, Virginia & Charleston Ry. Co. v. Vance, 115 Pa. 325. Subject to the requirement that the qualifications of a witness to give an opinion must appear and be passed upon by the court before he is permitted to do so, the rule obtains that if upon his preliminary examination he is shown to have any pretensions to speak on the matter, the determination of his competency rests much in the discretion of the trial judge, the value and the weight of the opinion expressed being of course a matter entirely for the jury: Ardesco Oil Co. v. Gilson, 63 Pa. 146; Mengell's Executors v. Mohnsville Water Co., 224 Pa. 120; Follansbee Bros. Co. v. Garrett-Cromwell Engineering Co., 48 Pa. Superior Ct. 183. Viewing the testimony as to the qualifications of these witnesses in the light of these well-

settled principles, we conclude that the plaintiffs were entitled to the benefit, before the jury, of the evidence they gave as to value.

Finding no error in the record warranting us in disturbing the verdict, the assignments of error are overruled and the judgment is affirmed.